UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:13-cr-67 |
| v. ) | |
| ) | |
| JERMAINE UNDERWOOD ) | *Collier / Lee* |

## REPORT AND RECOMMENDATION

Before the Court is Defendant Jermaine Underwood's ("Defendant") motion to suppress evidence, specifically a handgun, found on his person during a police patdown [Doc. 15].[1] After careful consideration of the evidence and arguments, I find no constitutional violation supporting suppression and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.     FACTS AND BACKGROUND**

Defendant is charged with being a felon in unlawful possession of a firearm and ammunition [Doc. 1]. During the first evidentiary hearing on August 29, 2013, the government presented the testimony of Chattanooga Police Department ("CPD") Officer Colton Krumrie ("Krumrie") and Defendant presented the testimony of Veronica Glasco ("Glasco"). Defendant's subsequent unopposed motion to reopen the evidence was granted [Doc. 29]. At the second hearing, Defendant presented evidence of Krumrie's testimony during a state court preliminary hearing concerning Defendant's arrest, which conflicted with his testimony at the initial suppression hearing on the issue of consent. A summary of the pertinent testimony follows.

---

[1] By standing order, the motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). The Government filed a response in opposition [Doc. 20] and an evidentiary hearing was held on August 29, 2013 and on September 16, 2013. In addition, each of the parties submitted post-hearing briefs [Doc. 34 & Doc. 35], which have been fully and carefully considered.

### A. Testimony of Krumrie

On August 29, 2013, Officer Krumrie testified as follows. Krumrie has been a patrol officer with CPD for three years working in the East Chattanooga area. On March 7, 2013 around 4:50 p.m., Krumrie was on patrol alone in his patrol car when he received a "shots fired" dispatch about a robbery at the Mercury Cab stand in the 900 block of Dodson Avenue, which is only four blocks from the Avondale Recreation Center ("Center") at 1305 Dodson Avenue. Based on dispatches or radio traffic between the police officers, Krumrie believed the suspects were three black male juveniles on foot with a .9 mm handgun. As Krumrie knew other patrol officers were closer to the Mercury Cab stand and would be able to respond to the scene of the robbery and attend to the victim sooner than him, Krumrie chose to look for the suspects instead. Based on his training and experience, Krumrie believed the two easiest places for juvenile suspects on foot to hide in the area were the nearby Woodland Apartments and the Center; he decided to look at the Center first.

When Krumrie arrived at the Center at about 5:00 p.m., there was a group of about eight black male juveniles in a room with a glass partition, separate from the basketball court where other kids were playing basketball. When Krumrie entered, he told everyone in the room that he was looking for suspects in a robbery and asked if anyone knew anything. No one responded with any information. Because the juveniles responded by "throwing such a fit," Krumrie called dispatch on his radio and asked for a repeat of the suspects' descriptions. Both he and the other persons present could hear the dispatch description as three black males: one who was short and heavy, wearing a blue shirt or jacket and khaki pants; one who was taller than the first, with a flat-top haircut; and one who was wearing khaki shorts (no other description). This process took about five minutes and some of the persons in the room (not Defendant) responded with a derogatory comment about the police

and complaints that Krumrie was harassing them.

Based on the description of the suspects, Krumrie decided that two persons present, Defendant and a person who turned out to be Defendant's brother, who were sitting next to each other, matched the suspects' descriptions. Defendant's brother was not heavy, but he could be considered short and he was wearing khaki pants and a long blue shirt. Krumrie engaged Defendant's brother first, asking if he had anything on him and telling him to turn around. Krumrie conducted a patdown of the brother's person, but did not feel any weapons.

Krumrie also suspected Defendant because he was the only black male he saw in khaki shorts at the Center, a likely place for juvenile suspects to go. Defendant was the only person wearing shorts in the room and Krumrie thought it was strange that Defendant was wearing shorts since it was "winter." Krumrie acknowledged the school uniform policy allows males to dress in khaki shorts or pants year-round. Although Defendant had a dreadlocks hairstyle, the first and third person's hairstyles had not been described in the dispatch. Krumrie asked Defendant to stand up and asked if he had anything on him. Defendant responded "No." According to Krumrie's testimony at the first hearing, Krumrie then asked Defendant if he "could check" and Defendant stood up and said "Yeah." Krumrie lightly patted down the outside of Defendant's clothing and felt a gun. Krumrie pushed Defendant against the wall and confiscated the gun, which turned out to be a loaded revolver, not the .9 mm gun used in the Mercury Cab stand incident. Krumrie immediately placed Defendant under arrest and called for backup to deal with the others present at the Center. His sergeant arrived in about four to five minutes.

Krumrie did not patdown any of the other persons in the room, because he was busy with Defendant. Krumrie arrested Defendant. During transportation to the jail, Defendant informed

3

Krumrie that he had a significant amount of marijuana in his pocket, which had not been found during Krumrie's patdown of Defendant's outer clothing for weapons, and Defendant made other incriminating statements.

On September 16, 2013, Officer Krumrie testified as follows at the reopened hearing. During the state court preliminary hearing held no more than a few weeks after Defendant's arrest, Krumrie testified he did not ask Defendant to consent to a patdown. Krumrie currently does not actually remember whether he asked for, and got, consent for a patdown, but he knows he would have performed a patdown regardless because of the use of a gun during the Mercury Cab stand robbery. Krumrie acknowledged his memory would have been fresher during the preliminary hearing when he testified he had not asked Defendant for permission to check him for weapons.[2]

### B. Testimony of Glasco

Glasco has worked at the Center for about a year, and she was working the afternoon/early evening shift on March 7, 2013. She was present when two police officers that she had seen before entered the Center that day. There were eight to ten juveniles, both male and female, in the front room plus her and the Defendant. Glasco's drawing of the room and the location of various parties in the room is the sole exhibit to the initial hearing, Defendant's Exhibit 1.

Glasco knew Defendant was older than the other kids, but she did not know he was an adult. Defendant had been at the Center that day playing basketball since around 2:30, which was before the rest of the juveniles arrived after school. Glasco knows Defendant and his brother only from her

---

[2] An audio recording of Krumrie's testimony during the state court proceedings is Defendant's Exhibit 2. Except for the issue of consent to the patdown, Krumrie's testimony was consistent with his testimony at the first suppression hearing. Indeed, it is even slightly more detailed as Krumrie said Defendant had on athletic shorts under his khaki shorts at the preliminary hearing.

4

work at the Center. All present in the front room (except perhaps Glasco) were wearing khaki bottoms and white uniform shirts, which are the nearby school's uniform, and some of the boys were also wearing hoodies. Glasco initially indicated the girls were wearing capris and some of the boys were wearing shorts. Later, on cross, she specifically testified all of the five boys in the room were wearing khaki cargo shorts.

Various police officers, but not necessarily Krumrie and the other officer he was with that day, come to the Center a couple times each month for diverse matters. The police had not been at the Center that month to her knowledge. Glasco could not recall what people were wearing the last time police officers came to the Center. When the officers arrived on March 7, she asked why they were there and they responded there were random shots fired in the area. She asked who they were looking for and they responded they were looking for suspects in the shooting. She asked the two officers for a description of the suspects and they told her that they were looking for suspects wearing khaki bottoms and "dark colored" hoodies. The officers did not say khaki shorts and she did not know they were looking for someone in khaki shorts.

The officers did not call dispatch for a description while at the Center. The officers were only in the Center about a couple of seconds before they approached the boys sitting on the couch, Defendant's brother and another boy. Both had hoodies on and the brother's hoodie was dark blue. An officer asked Defendant's brother if he had anything on him. The brother said "No." The officer then patted the brother down, but found nothing. The officer then patted the other boy on the couch down, but found nothing.

Then officer then went to Defendant, who was across the room from his brother standing against the wall by some chairs. Defendant was wearing a yellow hoodie. The officer asked

5

Defendant what he had on him and Defendant said, "Nothing." The officer patted Defendant down and found a gun. Glasco could not remember whether Defendant told the officer it was all right to pat him down. Defendant cooperated during the patdown and did not attempt to flee. No other officers arrived and nobody else was searched after Defendant's gun was found. The officers put Defendant in handcuffs and left without inquiring how long Defendant had been at the Center and nobody volunteered that Defendant had been at the Center since early afternoon. She could not remember what the second officer did while the other officer conducted all of the patdowns. Both officers were at the Center for about three to five minutes until the gun was found.

### C. Factual Conclusions

Concerning the pending motion, the most significant factual discrepancy in the witnesses's testimony at this point is whether Defendant was the only person present in the front room of the Center wearing khaki shorts. On the one hand, the ability of Krumrie to accurately recall all of the details of his encounter with Defendant has been fairly called into question given his conflicting testimony on the issue of whether he asked for and got permission to frisk Defendant. On the other hand, there is convincing testimony that Defendant's brother was in khaki pants, yet Glasco testified on cross examination that all of the males present were in shorts. In addition, her testimony that there were two officers present the entire time does not appear to be accurate. Although Krumrie's testimony on the issue of consent to the frisk was not consistent, I **FIND** his recollection that Defendant was the only male in the front room in khaki shorts to be consistent and more credible than Glasco's recollection that all of the males were in shorts after considering all of the testimony.

## II. ANALYSIS

The Fourth Amendment prohibits only unreasonable searches and seizures by federal law

6

enforcement and, by incorporation, the Fourteenth Amendment prohibits the same by state law enforcement. *See Aguilar v. Texas*, 378 U.S. 108 (1964); *Mapp v. Ohio*, 367 U.S. 643 (1961). A defendant, as the proponent of a motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated, *see Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978), but it is the government's burden to demonstrate by a preponderance of the evidence that a stop was constitutional. *See United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990); *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).

    A.    **The Detention and Frisk of Defendant**

The crux of the suppression motion is whether Krumrie had reasonable suspicion to detain and frisk Defendant under the totality of the circumstances. The parties agree that there are three types of constitutionally permissible warrantless encounters between police and citizens: "(1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and (3) arrests which must be based upon probable cause." *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008)). The parties further agree the encounter between Defendant and Krumrie implicates an investigative detention or *Terry* stop subject to Fourth Amendment protection. Thus, the detention must have been predicated upon reasonable suspicion.

It is well established that an officer may detain an individual for a brief period of time for investigatory purposes if the officer has a reasonable suspicion based on specific and articulable facts that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Saucedo*, 226 F.3d 782, 788 (6th Cir. 2000). Reasonable suspicion must be based on "specific and articulable

7

Case 1:13-cr-00067-TRM-SKL   Document 36   Filed 10/02/13   Page 7 of 14   PageID #: 139

facts" and "rational inferences from those facts." *Terry*, 392 U.S. at 21. Reasonable suspicion requires less than probable cause but more than an inchoate suspicion or hunch. *Saucedo*, 226 F.3d at 788-89. Whether an officer's suspicions are reasonable is assessed in the totality of the relevant circumstances. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). In other words, courts look to "the whole picture" to assess reasonable suspicion. *Id.*; *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *United States v. Caicedo*, 85 F.3d 1184, 1189-90 (6th Cir. 1996). For purposes of determining whether reasonable suspicion exists, a reviewing court must consider the totality of circumstances to determine whether the detaining officer has a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). Furthermore, officers are permitted to make inferences from, and deductions about, the total information known to them based upon their specialized training and experience. *Id.*

During an investigative detention, a police officer may conduct a protective "frisk" or "patdown" for weapons if she has a reasonable, articulable suspicion the suspect may be armed or the officer's or another's safety may somehow be jeopardized. *Terry*, 392 U.S. at 27. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citation omitted). *See also Adams v. Williams*, 407 U.S. 143, 146 (1972) (officer may conduct a limited protective search for concealed weapons when he "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others") (internal quotation marks and citation omitted)). The officer need not be certain a suspect is armed. The issue is whether a prudent person in the circumstances would be warranted in the belief his or her safety or that of others was in danger. Thus, the general test is whether the

8

surrounding circumstances give rise to a justifiable fear for personal safety. *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993).

The government argues Krumrie had reasonable suspicion of criminal activity supporting the detention and frisk of Defendant because Defendant and another person at the Center (who turned out to be Defendant's brother) matched the description of two of three persons who committed an armed robbery with shots fired. Based on his training and experience, Krumrie believed the Center was one of two likely places to find the perpetrators of the robbery given the ten minute lapse of time since the shooting, the distance between the scene of the shooting and the Center, and the description of the suspects as black males who looked like juveniles and who Krumrie believed were on foot. Krumrie credibly testified that upon his arrival at the Center, Defendant was the only black male in the front room of the Center wearing khaki shorts, which he found odd because it was winter.[3]

As noted above, Defendant argues Krumrie's testimony was not credible. In addition, Defendant argues khaki shorts are not unique, local area students wear khaki bottoms as part of their school uniform, and school policy allows the students to dress in khaki shorts year-round. Defendant urges the Court to give more weight to the testimony of Glasco that there were multiple males in khaki shorts contrary to Krumrie's testimony. Defendant also points out that Krumrie asked no questions in the encounter, such as how long Defendant had been at the Center, to dispel his suspicion before detaining and frisking Defendant. Further, Defendant argues there were multiple locations within the four block radius or ten minute walk/run of the robbery where suspects could hide. Defendant contends Krumrie had no information indicating the suspects were headed in the

---

[3] While no evidence of the weather that day was specifically presented, Krumrie testified it was a "winter" day, which is somewhat supported by Glasco's testimony that several juveniles in the Center were wearing hoodies.

9

direction of the Center, as Krumrie testified he heard no dispatches about the direction the robbers fled. Defendant also contends that because the suspect wearing khaki shorts was not described as having dreadlocks and wearing a light colored hoodie, it was not reasonable to suspect Defendant, who has dreadlocks and was in a yellow hoodie. Finally, Defendant argues that it was unreasonable to frisk Defendant because Krumrie did not testify he saw any evidence of a weapon on Defendant, such as a bulge in Defendant's clothing. As Defendant points out, Defendant did not engage in any type of furtive, suspicious, or evasive behavior at the Center.

In making his argument that all evidence, particularly the handgun found on his person, should be suppressed because the police lacked reasonable suspicion to detain and frisk him, Defendant relies on *United States v. Hudson*, 405 F.3d 425 (6th Cir. 2005), a case where the defendant was charged with armed robbery but evaded arrest for over a year. Based on an anonymous tip and some corroboration, the officers seized a vehicle in which defendant was a passenger. The court found the encounter was an impermissible Terry stop, holding "reasonable suspicion to stop a person, whether suspected of a past or ongoing crime, must rest on specific facts available to the officers before they initiate contact tending to show that the person stopped is in fact the person wanted in connection with a criminal investigation." *Hudson*, 405 F.3d at 438. Further, the court held an "officer's bare hope of finding a suspect at a particular location does not constitute a particularized and objective basis" for even a temporary seizure. *Hudson*, 405 F.3d at 438.

As argued by the government, the *Hudson* court also noted it was mindful that the police were not attempting to solve a recently committed crime, or an ongoing one, but rather to arrest a person suspected of having committed a felony over a year earlier. The *Hudson* court quoted *United*

10

*States v. Hensley*, 469 U.S. 221 (1985), which holds:

> The factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct. This is because the governmental interests and the nature of the intrusions involved in the two situations may differ. As we noted in *Terry*, one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection." A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

*Hudson*, 405 F.3d at 437 (quoting *Hensley*, 469 U.S. at 228-29 ) (citations omitted). The Hudson court held "resolution of the question whether reasonable suspicion existed in the first instance must be sensitive to whether the *Terry* stop was made to investigate a crime committed beyond the recent past." *Hudson*, 405 F.3d at 437 (citing *Hensley*, 469 U.S. at 228-29 and 4 Wayne R. Lafave, *Search and Seizure: a Treatise on the Fourth Amendment* §§ 9.2, 9.5 (4th Ed.2004)).

It is well settled that two conditions must be met for a Terry stop and frisk to be lawful:

> First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Arizona v. Johnson*, 555 U.S. 323, 326 (2009). *See also United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). "Pertinent circumstances include the officer's own direct observations, dispatch

information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir.2008) (citations omitted). Reasonable suspicion must be determined at the point of seizure. *See United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008).

It is not necessary to address the out-of-circuit cases argued by the parties, as the binding precedent from the Supreme Court and the Sixth Circuit Court of Appeals ("Sixth Circuit") is more than sufficient to address the law, and none of the cited cases directly address the exact factual scenario at issue, which is to be expected. And, while there are many cases in the Sixth Circuit regarding the law of reasonable suspicion, none appear to involve the exact circumstances at issue in this matter. One such case, *United States v. Lindsey*, 114 F. App'x 718 (6th Cir. 2004), is illustrative of the application of reasonable suspicion to a shooting investigation. In *Lindsey*, the court held the defendant's location, similar clothing, race, gender, and running consistent with flight was enough to constitute reasonable suspicion. *Id*. at 722-23. Of course, here, there is no evidence of flight. In *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000), a "car roughly matching the appearance of [a suspect's] in color and style was reportedly seen outside [a] residence at the time the burglary occurred. Minutes later, an off-duty officer observed a vehicle matching the [previously] reported description traveling southbound away from the vicinity of the[] residence at a high speed" and reported to other deputies that the automobile's front grill was missing. Another deputy spotted and pulled over a vehicle traveling in the reported direction with the distinctive description, and at a time consistent with the time needed to travel to that point from the residence. *Id.* The Sixth Circuit held that based upon the final deputy's knowledge of the time and area coupled with the other reported information, including the description and direction of travel, the deputy had

reasonable suspicion to stop the vehicle. *Id*. Here, among other distinctions, Krumrie had no knowledge regarding the purported direction of travel of the suspects. In yet another case, the Sixth Circuit held a defendant's presence in a high-crime location and the lateness of the hour, without more, does not give rise to reasonable suspicion to support an investigatory stop, but such factors may be considered in the totality of the circumstances. *United States v. Johnson*, 620 F.3d 685 (6th Cir. 2010). In this matter, the hour was not late and there is nothing unusual about finding black male juveniles at the Center after school. These cases, and the cases cited by the parties, demonstrate that reasonable suspicion is an abstract concept not susceptible to a neat set of rules; instead, each case must be determined based on the totality of its particular circumstances.

In the instant matter, the description of the suspects came from dispatch as the result of an ongoing police investigation of a "shots fired" armed robbery. Defendant was detained within four blocks and ten minutes of the robbery at one of the two most likely places for the described fleeing suspects to hide in the area, based on Krumrie's three years of experience patrolling the area. Public safety was surely threatened as one of the suspects had fired a gun in a robbery just ten minutes prior. Krumrie had no description of the height, weight, or hairstyle of the suspect in shorts and Defendant made no evasive, furtive, or suspicious moves at the Center, but Krumrie found it unusual to be wearing khaki shorts on that given winter day. Giving the required due deference to Krumrie's experience and training, and remembering that reasonable suspicion is a minimal level of objective justification based on the totality of the circumstances, I **FIND** Krumrie had reasonable suspicion to briefly detain Defendant. As the reasonable suspicion related to Defendant's possible involvement in an armed robbery with shots fired, I also **FIND** the brief patdown of Defendant's outer clothing for weapons was reasonable, was a minimal intrusion under the circumstances, and was well within

13

the permissible range of conduct in the context of a *Terry* stop of a person suspected of being armed and dangerous in order to protect the public at the Center and Krumrie. *See Terry*, 392 U.S. at 23-24, 27, 30-31.

Given these findings, it is not necessary to address the government's alternative argument that even if the Fourth Amendment was violated by the stop or frisk, exclusion is not an appropriate remedy under *Herring v. United States*, 555 U.S. 135 (2009).

### III. CONCLUSION

For the reasons stated herein, I **RECOMMEND** that Defendant's motion to suppress [Doc. 15] be **DENIED**.[4]

/s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).